IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs March 29, 2022

**STATE OF TENNESSEE v. NIKOS BURGINS**

**Appeal from the Criminal Court for Knox County**
**No. 97139     Bob R. McGee,[1] Judge**

**No. E2021-00620-CCA-R3-CD**

The Defendant, Nikos Burgins, was convicted by a jury of five counts of aggravated rape, four counts of especially aggravated kidnapping, and one count of aggravated robbery, for which he received an effective sentence of ninety-six years' incarceration.  On appeal, the Defendant argues that (1) the evidence was insufficient to support his convictions for especially aggravated kidnapping, contending that the State failed to establish removal or confinement that exceeded the accompanying felonies and that the evidence only established one count of especially aggravated kidnapping per victim; (2) the trial court erred by allowing the State to impeach the Defendant with a prior aggravated assault conviction; (3) the trial court erred by allowing the two victims to be present in the courtroom prior to their testimony; and (4) the trial court erred by admitting evidence of the Defendant's letters, averring that they were not properly authenticated.  Following our review, we remand the case for the entry of corrected judgments reflecting one conviction for especially aggravated kidnapping per victim.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**
**in Part and Reversed in Part; Case Remanded**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and NORMA MCGEE OGLE, JJ.,  joined.

J. Liddell Kirk (on motion for new trial and appeal) and Susan E. Shipley (at trial), Knoxville, Tennessee, for the appellant, Nikos Burgins.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Senior Assistant Attorney General; Charme P. Allen, District Attorney General; and Leslie A. Nassios, Assistant District Attorney General, for the appellee, State of Tennessee.

---

[1] Judge McGee retired in 2019, and Judge Kyle A. Hixson presided over the Defendant's motion for new trial.

## OPINION

## FACTUAL BACKGROUND

This case arises out of the February 1, 2011 home invasion of A.L.'s [2] apartment, during which the Defendant and co-defendant Lindell Davis entered the apartment, took items from A.L. and her friend, S.T. (collectively, "the victims"), at gunpoint, and the Defendant raped them in one another's presence. Thereafter, the Knox County Grand Jury returned an eleven-count indictment against the Defendant, charging him with five counts of aggravated rape, a Class A felony; four counts of especially aggravated kidnapping, a Class A felony; and two counts of aggravated robbery, a Class B felony. See Tenn. Code Ann. §§ 39-13-305, -402, -502.

### A. Trial

At trial, A.L. testified that she was twenty-five years old and that on February 1, 2011, she was living in a South Knoxville apartment complex. At about 8:30 a.m., S.T. arrived at the apartment to help A.L. take her son to school. They returned to the apartment and made some telephone calls. A.L. stated that her friend Matt Bumby called and arranged to buy marijuana at A.L.'s apartment. Mr. Bumby arrived, bought the marijuana, and left. A.L. took a shower, and Mr. Bumby subsequently called her, asked if she was still at home, and inquired about purchasing more marijuana. When Mr. Bumby arrived, A.L. unlocked the door and led Mr. Bumby to her bedroom, where she began to weigh out more marijuana for him.

A.L. testified that she heard S.T. scream and that when she turned around, a man was standing in the door with a gun pointed at A.L.'s face. In court, A.L. identified the man she saw as the Defendant. A.L. stated that the Defendant ordered her to get on the ground and that she and Mr. Bumby complied. A.L. said that a second man, whom she identified as co-defendant Davis, brought "stuff" into the room and yelled at her, asking, "[W]here's your money, where's the drugs at and, b--ch, tell me where you[r] money's at, I know you got money[.]" A.L. told the men that she did not have any money, and co-defendant Davis accused her of lying.

A.L. testified that while the Defendant stayed with her, S.T., and Mr. Bumby, co-defendant Davis went through the apartment "tearing everything apart." The Defendant told A.L. to stand, grabbed her by the back of her pants, "carried" her into the living room where co-defendant Davis was "going through stuff," and ordered A.L. to "put [her] face in the couch." The two men repeatedly asked A.L. where her money and drugs were

---

[2] It is the policy of this court to refer to victims of sexual offenses by their initials.

located.  A.L. noted that they "scared the h-ll out of" her, that they yelled and called her a "wh--e and a b--ch," that they stated they were going to kill A.L. and the others, and that they said that if they found A.L.'s money, they would shoot A.L. in the face.

A.L. testified that the Defendant took her back to her bedroom and told her to lie down before ordering her to stand up and take off her clothing.  A.L. undressed but kept on her underwear and brassiere.  The Defendant told Mr. Bumby to leave the room, then turned back to A.L. and "asked [her] if [she] was f---ing stupid, because he told [her] to strip[.]"  The Defendant was still holding the gun.  A.L. stated that she undressed the rest of the way, that the Defendant then told S.T. to stand and undress, and that S.T. complied.

A.L. testified that the Defendant "started like feeling in [her] privates and just on [her] body . . . patting [her] down."  The Defendant told A.L. to lie down on the bed; he bent A.L. over the bed face down and pressed her face into the mattress.  A.L. stated that S.T. was also face down on the bed.  When A.L. stated that she could not breathe, co-defendant Davis stated, "[B]--ch, you're not supposed to breathe[.]"  The Defendant "loosened up," and A.L. noted that she did not hear co-defendant Davis in the bedroom again.

A.L. testified that the Defendant started "putting his hands inside" her vagina; she noted that he "was pushing pretty hard" and that she told him that it hurt.  A.L. stated that she was menstruating and that the Defendant removed the tampon she was wearing before digitally penetrating her again.  A.L. stated that the Defendant also digitally penetrated S.T. and that he "kept going back [and] forth" between the victims during the penetration.  After the Defendant removed A.L.'s tampon, he told S.T. to get on her knees on the bed.  A.L. saw the Defendant place his penis in S.T.'s vagina "for a minute."  The Defendant told both victims to get on their knees on the floor to perform oral sex on him.

A.L. testified that the Defendant threatened to shoot both victims if their teeth touched his penis.  The Defendant alternately penetrated A.L.'s and S.T.'s mouths with his penis.  A.L. stated that the Defendant grabbed the back of her head and pushed it toward him such that she began to gag.  When A.L. stated that she was going to throw up, the Defendant let her go and returned to S.T.  The Defendant told S.T. that he was going to "n-t in [her] mouth and don't swallow."  After the Defendant ejaculated into S.T.'s mouth, he made the victims stand and took them to the bathroom at gunpoint; he made A.L. face toward the shower and made S.T. "wipe off" and try to wash out her mouth.

A.L. testified that the Defendant instructed the victims not to call the police, and he took the victims into the bedroom and made them lie down on the floor.  Over the course of five to ten minutes, the Defendant asked the victims "why he should leave [them] alive," and the victims told the Defendant that they had children.  The Defendant asked the victims if they would call the police, and the victims answered negatively.  The Defendant told the

victims to remain still and that if they moved, he would kill both of them. A.L. said that the Defendant was "hateful," cursing, mean, and angry.

A.L. testified that after an unspecified amount of time, she did not hear any movement in the apartment. A.L. asked S.T. if she thought the men were gone, but S.T. did not answer. A.L. ran and locked the front door. A.L. and S.T. did not speak while they searched for their clothing, and S.T. ran downstairs to find a telephone. A.L. stated that she unsuccessfully searched for her and S.T.'s cell phones in the apartment and that the Defendant and co-defendant Davis took the cell phones.

A.L. testified that she eventually used a neighbor's telephone to call her cell phone, but there was no answer. However, A.L.'s cell phone number immediately called the neighbor's telephone back; A.L. was afraid to answer because she knew that the Defendant and co-defendant Davis had her cell phone. A.L. and S.T. left because they were afraid the men would return; they drove to a hotel in which S.T.'s boyfriend, "Spy," was staying. The victims called Spy, who came back to the hotel within ten or fifteen minutes. Spy accompanied them back to A.L.'s apartment, and they used Spy's cell phone to call 9-1-1. A.L. estimated that thirty to forty-five minutes passed between the rapes and when they decided to go back to the apartment.

A.L. testified that in addition to the cell phones, her son's Wii video game system and portable DVD player, A.L.'s cash, and a small amount of marijuana were missing from the apartment. When asked why the victims did not stop at a nearby fire station or delicatessen, which were both between A.L.'s apartment and the hotel, A.L. responded that she "couldn't think straight at all" and wanted to get to a safe location.

A.L. testified that when the police arrived, the victims tried to tell them everything they could; she said that she was shaken and could not remember exactly what she told the officers. She stated, though, that because she was afraid, she did not disclose that she sold marijuana to Mr. Bumby. A.L. told the police that Mr. Bumby was present and that the Defendant and co-defendant Davis let him go in the middle of the robbery. A.L. said that after the robbery, she never heard from Mr. Bumby again. A.L. estimated that Mr. Bumby left the apartment about thirty minutes "before it was over," and he did not call the police.

A.L. testified that she accompanied S.T. to the hospital and that one of the nurses there sent A.L. to Safe Haven, where A.L. was given information about available help. The following day, A.L. received "all the medications and shots" and underwent medical testing. A.L. stated that she had never met the Defendant before and that she had no reason to fabricate allegations against him. A.L. said that she learned the Defendant's identity after she selected his photograph in a lineup. A.L. identified her completed photographic lineup including her signature, which was received as an exhibit. A.L. stated that she was unable to identify co-defendant Davis in a similar lineup because she never saw his face,

although she described him as "shorter and fat." A.L. said that both men wore black and that the Defendant wore black and white shoes and gardening gloves.

A.L. identified crime scene photographs of her apartment; she averred that the apartment was generally "very clean" and that the photographs reflected "[e]verything was torn apart." She pointed out couch cushions thrown on the floor, open drawers and cabinets in the kitchen and bedrooms, a bin of clothing that had been partially emptied onto the floor, and clothing on the bathroom floor that S.T. used it to clean herself after the rapes. A.L. noted that her son's Wii system, which was usually in front of the television, was absent in the photographs.

A.L. testified that the photographs generally depicted the state of her bedroom during the rapes; however, she noted that after the men left, she and S.T. moved some things as they tried to find their clothing and that not as many clothes were on the floor during the assault. A.L. identified in the photographs where she and S.T. were located on the bed; she said that S.T. was "up at the top," whereas she was "at the end down here[.]"

A.L. testified that one of the two men struck her when she was face down on the floor at the beginning of the robbery. A.L. said that it startled her and hurt, that she was not expecting to be hit, and that she had a lump on her head afterward. A.L. stated that due to the manner in which the Defendant wrapped her hair around his hand and grabbed it, some of her hair broke, and she had to get six to eight inches of it cut off. She affirmed that during the rapes, the Defendant pointed the gun at both victims' heads and told them that he would shoot them. A.L. described her demeanor as "like a two[-]year-old" and stated that both she and S.T. were crying, shaking, and afraid the Defendant would kill them.

A.L. stated that she did not immediately realize which items were taken from the apartment and that she reported the missing items at her second interview with a detective. A.L. noted that the detective asked why she had not included the items during her first interview while the police investigated the crime scene, and she responded that she was "shaken up" and not looking for anything missing.

A.L. testified that Travis Burgins, a neighbor, recognized the Defendant as he fled the scene. A.L. stated that on the day of the robbery, she and S.T. split one hydrocodone pill; she denied that it impaired her ability to understand the relevant events. A.L. further denied that she had ever conversed with the Defendant about buying pills or other drugs from him. She reiterated that she had never seen him before this incident.

On cross-examination, A.L. testified that she lived at the apartment complex for one year and that S.T. had previously rented her own apartment two doors down from A.L., although S.T. also used her mother's mailing address on Morning Crest Way, which was

nearby.  A.L. acknowledged that she was not examined or photographed at the hospital and that she was not treated for her head wound.

A.L. testified that Mr. Bumby was about six feet, five inches tall and weighed 260 pounds.  She denied that she sold prescription pills to Mr. Bumby or bought them from him.  A.L. did not recall telling Investigator Bryan Moran that she sold pain pills to Mr. Bumby, and she stated that if she did such, it was because she was terrified.  A.L. similarly denied telling Investigator Moran that her prescription pain medication or other drugs were stolen in the robbery.  She affirmed that she did not want to get into trouble.  When asked whether Investigator Moran lied when he submitted a warrant related to the stolen pain medication, A.L. responded that she did not believe he would lie.  A.L. agreed that at trial, she was admitting to having sold marijuana.  A.L. stated that only two or three people bought marijuana at her apartment.  She noted that she knew Mr. Bumby through her brother and that she trusted him.  She denied, though, that she believed Mr. Bumby would not turn her in to the police.  A.L. said that Mr. Bumby arrived at her apartment for the first time at about 9:00 a.m.  She agreed that Mr. Bumby was a friend and that she had never "signed any kind of warrant" against him.

A.L. denied that she or S.T. smoked marijuana during the morning before the robbery.  When asked why S.T. would have told hospital staff that she was smoking marijuana at 11:00 a.m., A.L. responded, "No because that couldn't have been true.  She wouldn't have said that. "  A.L. agreed that the incident occurred before 11:00 a.m.  A.L. acknowledged that she and S.T. took hydrocodone to get high, not to relieve pain.

A.L. testified that she never identified co-defendant Davis to the police and that she had been informed of his identity by police.  A.L. estimated that she drove to the hotel at about 10:00 or 10:15 a.m.  She acknowledged that they did not call 9-1-1 from the hotel and that she called Martino Creed Settles[3] before the police.  A.L. stated that the police arrived at her apartment around 11:40 a.m.  A.L. recalled telling the 9-1-1 dispatcher that S.T. had taken a shower.  A.L. said that prior to the robbery, she had a disagreement with a friend named James, who was dissatisfied with her marijuana prices.

S.T. testified that she was thirty-two years old and that she had known A.L. for at least eleven years.  S.T. stated that she graduated from high school with a "Special Education diploma," that she had a learning disability, and that it was easier for her to understand people when they used smaller words, spoke more slowly, and explained things to her.  S.T. affirmed that at the time of trial, she and A.L. were both employed, although in February 2011, S.T. was unemployed.

---

[3] It was unclear who this individual was.

S.T. testified that on February 1, 2011, she went to A.L.'s apartment to pick up A.L. and A.L.'s son and take him to school because he was late. After dropping him off, she and A.L. returned to A.L.'s apartment, and they sat in the kitchen and made telephone calls. S.T. agreed that she was between apartments and was looking for a place to live while she stayed at the hotel.

S.T. testified that Mr. Bumby came to the apartment, and he and A.L. went to her bedroom while S.T. stayed in the kitchen. After Mr. Bumby left, A.L. took a shower. S.T. stated that later, Mr. Bumby called A.L., said that he was at the front door, and asked her to let him inside. A.L. opened the door, and as she and Mr. Bumby walked to her bedroom, S.T. passed them while walking to the kitchen. S.T. said that she was looking at her cell phone and opening the refrigerator door when she saw "something brush past quickly by [A.L.'s] window" to the left. S.T. "looked back to see what it was and by the time [she] looked back[,] they [were] already in the house."

S.T. testified that the Defendant walked to A.L.'s bedroom and that co-defendant Davis walked over to S.T. and told her to get down. S.T. began screaming and dropped her cell phone. S.T. stated that co-defendant Davis pointed a gun at her. Co-defendant Davis took S.T. to A.L.'s bedroom, where the Defendant was hitting A.L. Co-defendant Davis told S.T. to stop looking at A.L. and to lie on the ground. S.T. stated that she had her eyes closed while the Defendant was "messing with" A.L. and co-defendant Davis was "ransacking the house." S.T. said that co-defendant Davis took A.L. out of the bedroom, asked A.L. where the money and marijuana were, and threatened to shoot A.L. if he found money. Co-defendant Davis also threatened to kill S.T.

S.T. testified that after five or ten minutes, the Defendant brought A.L. back into the bedroom and told her and S.T. to take off their clothing. The Defendant made both victims "lay side by side." S.T. stated that she was "at the top, like the majority of the middle" of the bed and that A.L. was "at the edge." S.T. testified consistently with A.L. relative to the Defendant's digitally penetrating the victims, A.L.'s statement to the Defendant that he was hurting her, and the Defendant's removing A.L.'s tampon.

S.T. testified that the Defendant penetrated her vagina with his penis from behind, then forced her to put his penis in her mouth. The Defendant threatened to shoot S.T. if she bit his penis. S.T. stated that the Defendant went back and forth between her and A.L., penetrating their mouths with his penis about four times. S.T. said that the Defendant said, "I'm going to n-t in your mouth and don't swallow." S.T. stated that she felt disgusted and that after, the Defendant made the victims stand up and go into the bathroom. The Defendant wiped S.T.'s mouth with A.L.'s blue shirt, and S.T. wiped her vagina with A.L.'s blue pants before throwing both items on the ground. A.L. faced the shower. The Defendant took them back into the bedroom, made them lie down, and repeatedly asked if they would call the police. After the Defendant left, they remained in the bedroom for a

time until A.L. got up and locked the door. S.T. stated that she was "shocked" and "messed up with it" and that she stayed on the floor for a while. They looked for their clothes and dressed, and S.T. ran outside to find help. S.T. stated that she spit on the concrete outside the front door because she could still feel the Defendant's semen in her mouth.

S.T. testified that she saw Tyran Bentley downstairs and that after she informed Mr. Bentley of the situation, he told her that he had seen the Defendant leaving the area. S.T. and A.L. went to S.T.'s hotel. When asked why they did not stop at a public place or call 9-1-1 before going to the hotel, S.T. responded that she was afraid and that the first place she could think to go was to "call on" her boyfriend. S.T. stated that at the hotel, she took a shower but did not wash with soap. Eventually, they returned to A.L.'s apartment and spoke to the police. S.T. did not remember if she told the police anything about drugs, although she agreed that she and A.L. did not want the police to know that A.L. had been selling marijuana. S.T. affirmed that she and A.L. shared a hydrocodone pill that morning, and she denied that it had any effect on her ability to remember who raped her. S.T. identified the Defendant in the courtroom as the rapist. She stated that she did not know the Defendant or co-defendant Davis before the incident. S.T. identified photographic lineups in which she identified the Defendant and co-defendant Davis. S.T. also described the men's clothing to the police, and she identified the clothing entered at trial and in police photographs as the items she saw. S.T. stated that Mr. Bumby had not contacted her since the incident.

S.T. testified that she went to the hospital for treatment and that she had soreness and tenderness around her vagina. She agreed that DNA was found inside her vagina that belonged to someone other than the Defendant, and she stated that she and her boyfriend had intercourse the night before the incident. S.T. did not remember whether she told the nurse about the recent intercourse, although she thought she probably reported it. She agreed that the Defendant's sperm was found inside her mouth. S.T. did not recall telling the nurse that she smoked marijuana at 11:00 a.m. on the morning of the robbery, and she averred that the nurse must have misunderstood her. She agreed that she was in shock and could not think when she went to the hospital and when she spoke to the police.

On cross-examination, S.T. testified that she gave Investigator Moran an address on Morning Crest Way that was near A.L.'s apartment complex. S.T. did not remember whether she told a nurse that her address was in A.L.'s apartment complex. She stated that at the time of the robbery, she drove a Mercury Marquis. S.T. denied knowing Mr. Bumby, although she acknowledged that a large, blonde man came to A.L.'s apartment that morning. S.T. knew that he was there to buy marijuana. She denied that Mr. Bumby also bought prescription pain pills from A.L. S.T. averred that she knew no reason why A.L. would have told Investigator Moran that she was selling pain pills; similarly, she knew no reason why Investigator Moran would have included in his report that A.L. told him that her prescription pain medication was stolen.

S.T. testified that Mr. Bumby was made to lie on the bedroom floor with her and A.L. She acknowledged that in a previous court hearing, she testified that she and A.L. did not use drugs in the morning before the robbery. S.T. agreed that this was a lie, although she noted, "Maybe I misunderstood what they were saying[.]" S.T. agreed that she did not ask Tyrone Goodwin[4] to call 9-1-1. She agreed that she did not go to her mother's residence on Morning Crest Way or to the police station after the rapes. S.T. acknowledged that she did not call the police from her hotel.

S.T. testified that Officer Hamblin did not take photographs of her or A.L. and that she did not see Officer Hamblin collect A.L.'s severed hair as evidence. Defense counsel asked S.T. several times if she told the nurse that she had not had sex for three days before the robbery; after discussion between the parties and the trial court, defense counsel read from the sex assault information form a question, which read, "Any consensual coitus in the last 72 hours?" S.T.'s answer on that form was negative. S.T. said that she must have misunderstood and that she did not understand the meaning of the word "coitus." S.T. stated that she "guess[ed]" that she did not tell the nurse that she had sex with her boyfriend the night before the robbery.

On redirect examination, S.T. testified that she saw A.L.'s torn hair, and she affirmed that the Defendant tore it. S.T. stated that she never got her cell phone back after the incident.

Knoxville Police Department (KPD) Forensic Technician Tiffany Hamblin testified that on February 1, 2011, she was dispatched to the crime scene and that she photographed the apartment, collected clothing from the apartment's bathroom, and took DNA swabs from the victims, the bathroom's sink and drain, and a location on the outside sidewalk where S.T. indicated that she spit.

Ms. Hamblin identified additional photographs she took on the day before trial, which depicted A.L.'s apartment complex. The complex consisted of several freestanding two-story buildings with doors leading to the outside. A.L.'s apartment was on the second story top corner of one building facing a parking lot, and from that apartment, a person would have had to pass two other apartments on the concrete walkway before accessing the stairs.

The photographs Ms. Hamblin took on February 1, 2011, showed various angles of the apartment as it appeared when the police arrived. The living room had couch cushions and pillows thrown on the floor; a linen closet was open and some of the contents were

---

[4] During the various testimony, the witnesses referred to a Tyrone Goodwin, a Tyran Goodwin, and a Tyran Bentley. It was unclear whether they were the same person.

spilling out onto the floor; a desk drawer in the dining area was open; and some of the kitchen drawers were pulled open. A pink bath towel, curlers, a blue pair of jogging pants, a blue sports jersey, a pair of white shorts, a pair of underwear, and a plaid blanket were on the bathroom floor. A room appearing to be a child's bedroom had papers on the floor, stuffed animals piled on the bed, and some of the drawers in a plastic dresser partially open. Another bedroom with an adult-sized bed was in disarray—the floor was covered in papers, and a wooden drawer had been removed from the furniture and placed on top of the mattress. A brassiere, another empty dresser drawer, and several pairs of underwear and other pieces of clothing were on the bedroom floor. The bed's comforter was on the floor, a body pillow was propped up between the bed and the floor, and the sheets had been partially removed.

Ms. Hamblin testified that the couch cushions' having been removed and the drawers being open were consistent with a robbery having taken place. Ms. Hamblin also identified the Defendant's buccal swab and a sexual assault evidence (SAE) kit, which she did not collect.

On cross-examination, Ms. Hamblin testified that she was not the first person on the scene and did not know if the apartment door was locked or unlocked. Ms. Hamblin acknowledged that some portions of the apartment, including CDs and a cabinet in the living room, photographs on the wall, parts of the child's bedroom, items in the adult's bedroom headboard, and an electronic device did not appear to have been disturbed. Ms. Hamblin denied having collected a tampon from the apartment floor. She clarified that the location on the walkway where she collected a saliva sample was to the right of the door as she exited the apartment. Ms. Hamblin agreed that a fire station and delicatessen were near the apartment complex.

Former KPD Forensic Technician Danielle Wiberg testified that on February 1, 2011, she photographed the Defendant's clothing, including a pair of black and white size 12 Adidas sneakers with a "nylon top" and "latex spray bottoms," a pair of gray and green "Workforce" gloves, and a black size 6XL hooded sweatshirt. She identified the following additional personal items collected from the Defendant: a black and gray striped "galaxy flannel type shirt," size 4XL; a gray toboggan with a "Dark Star logo"; a package of Newport cigarettes and lighter; size 40 black pants with a brown leather belt; change; and blue and grey boxer shorts.[5]

Co-defendant Davis testified that he had previously been convicted in Hamilton County of attempted carjacking, aggravated assault, and a felony weapons charge in 2004; he had also been convicted of a federal firearm offense. He stated that on April 16, 2012,

---

[5] Several additional law enforcement witnesses testified about chain of custody. Because chain of custody is not at issue on appeal, we have omitted those witnesses for the sake of brevity.

he wrote a letter to the District Attorney General's Office about his charges in the present case, after which he and his attorney met with the prosecutor. Co-defendant Davis denied that he had made any agreement with the State in exchange for his testimony.

Co-defendant Davis testified that on February 1, 2011, he and the Defendant went to A.L.'s apartment to obtain drugs and money. He stated that an acquaintance nicknamed "Fats" knew A.L. and gave them a ride to the apartment complex. There, he the Defendant met Mr. Bumby. Co-defendant Davis explained that Mr. Bumby "went pretty much like a decoy . . . to make sure that the people [were] . . . present or, you know, not there." Co-defendant Davis stated that Mr. Bumby was in the back of the apartment "going on with [A.L.]" when co-defendant Davis and the Defendant entered. Co-defendant Davis stated that during the incident, co-defendant Davis saw two nude women on the bed in the bedroom, and he described their respective positioning. He stated that the women were afraid and crying and that the Defendant "had the gun over them." Co-defendant Davis stated that the Defendant had S.T.'s "behind like spread" and that he asked the Defendant what he was doing and said that they should go. According to co-defendant Davis, the Defendant responded that he was looking for the money, and after asking the Defendant to leave four or five times, co-defendant Davis left the apartment. He stated that Mr. Bumby exited the apartment fifteen to twenty seconds later and that they walked up a nearby hill to Fats's car and waited for the Defendant.

Co-defendant Davis testified that the Defendant eventually ran up the hill and got inside the car; he noted that the Defendant's zipper was open and that the Defendant was sweaty. The Defendant had a cell phone with him, which rang, and co-defendant Davis told the Defendant that they needed to get rid of it because it had "tracking devices" on it. Co-defendant Davis told the Defendant to turn the phone off and throw it out the window. They drove to a different apartment complex and then to a bank, where co-defendant Davis exited the car. Mr. Bumby's romantic partner had followed them from the second apartment complex to the bank, and Mr. Bumby got into her car and left. Co-defendant Davis stated that he had never met Mr. Bumby before the robbery.

On cross-examination, co-defendant Davis testified that he had been charged in the present case with two counts of especially aggravated kidnapping, two counts of aggravated robbery, and one count of aggravated burglary, which carried potential sentences of twenty-five to forty years, twelve to twenty years, and six to ten years, respectively. He affirmed that he was from Chattanooga and that all of his previous convictions were in Hamilton County. He stated that he was in Knoxville because he lived at Midway Halfway House. Co-defendant Davis said that Fats, whose legal name he did not know, was also from Chattanooga.

Co-defendant Davis testified that he hoped to receive a shorter sentence as a result of his testimony. He agreed that it was "up to [him] to convince the prosecution that [he

was] telling the truth[.]" He maintained that no plea offer was discussed, and he said that he asked his attorney if he could obtain any type of leniency by telling the truth. Co-defendant Davis averred that he had no plea agreement to testify against someone from Chattanooga. He stated that this case was the only one in which he was asked to testify.

Co-defendant Davis denied that he pointed a gun at A.L. and S.T. or threatened to kill them. He elaborated that he "point[ed] fake like [he] had a gun," but claimed that he only had a cell phone in his hand. He agreed that if the victims testified that he had a chrome colored pistol, that would be a lie. Co-defendant Davis denied that the prosecutor had agreed not to refer to another federal firearm charge.

Co-defendant Davis testified that the robbery plan came about because he asked Fats for money. Fats replied that he was "down bad" and that when co-defendant Davis stated he was "hurting," Fats told him that he knew where co-defendant Davis could get "some little quick money" and "put [co-defendant Davis] on this robbery."

Co-defendant Davis testified that during the robbery, he entered the apartment and saw S.T. in the kitchen. He told S.T., "[G]et in that d--n room," referring to the bedroom, and said, "B--ch, get in that room," and S.T. complied. He stated that the police never collected a DNA sample from him, and he noted that he was arrested months after the robbery "on a secret indictment." Co-defendant Davis agreed that the Defendant also stayed at Midway Halfway House and that he was present when the Defendant was arrested. Co-defendant Davis affirmed that on that occasion, he did not volunteer to the police that he knew about the robbery.

Co-defendant Davis testified that he took Zoloft and Depacote in prison for "multi personalities or something . . . like that." He stated that he had not received a mental health diagnosis and that he was given different medications after he sought help stemming from personal problems and being incarcerated.

Covenant Health Registered Nurse Tracy Blackburn testified that she had been a sexual assault nurse examiner for almost six years and that she interviewed and examined S.T. on February 1, 2011, at 2:00 p.m. She identified her report, in which she documented that S.T. gave an account of the rapes that was generally consistent with her trial testimony.

Ms. Blackburn's physical examination reflected no injuries to S.T.'s face, mouth, or chest, but the external area around the vagina was "very tender," although there was no redness, tears, or bleeding. Ms. Blackburn testified that in the majority of vaginal assaults, no injury was present because a woman of reproductive age produced estrogen that "strengthen[ed] and thicken[ed] the vagina so that it [could] withstand force." S.T. also complained of burning on her inner left thigh. Ms. Blackburn noted that S.T. cried at times and was very cooperative. Ms. Blackburn stated that S.T. reported having a learning

disability. Ms. Blackburn identified the SAE kit containing swabs she took from S.T.'s mouth and vagina.

On cross-examination, Ms. Blackburn testified that S.T. reported her address as being at A.L.'s apartment complex. Ms. Blackburn did not order a toxicology test in this case. Ms. Blackburn agreed that S.T. reported having smoked marijuana at 11:00 a.m. that morning. She stated that she asked S.T. if she had had consensual sex in the last seventy-two hours and that S.T. answered negatively. Ms. Blackburn affirmed that she found no bruises, scratches, or abrasions on S.T. Ms. Blackburn stated that consensual sex could sometimes produce injuries, although sometimes it did not. She agreed that having sex with more than one person in a short amount of time could increase the likelihood of tenderness regardless of whether the sex was consensual.

Ms. Blackburn testified that she took swabs of vaginal secretions near S.T.'s cervix; she stated, though, that S.T. reported that no ejaculation occurred during the vaginal penetration. Ms. Blackburn stated that S.T. conveyed that A.L.'s friend, Mr. Bumby, was in the room for a certain portion of events, was made to lie on the floor in the bedroom, and left before the rapes occurred. Ms. Blackburn agreed that S.T. never mentioned spitting on the sidewalk outside the apartment. She said, though, that she stopped the interview after S.T. described A.L.'s locking the door after the assailant left.

On redirect examination, Ms. Blackburn testified that she generally asked patients if they had "sexual activity, sexual intercourse" rather than asking about "consensual coitus" because many people did not know what that meant. She stated that the seventy-two-hour window was a standard in Tennessee for evidence collection. Ms. Blackburn noted that S.T. was oriented to time, situation, person, and place. She stated that S.T. gave the following description of the two robbers: "[N]umber one was black, husky build, black hoodie, redneck gloves, and a little hair on his chin;" and "[N]umber two was black, slim, tall, black hoodie with white or blue black shoes[.]" S.T. reported that the two men were strangers to her and that a friend had identified the second man as the Defendant. Ms. Blackburn agreed that S.T. said several times that the taller man was the assailant.

TBI DNA Serology Analyst Keith Proctor, an expert in serology, testified that he examined S.T.'s vaginal and oral swabs, as well as swabs taken from concrete, jogging pants and a blue sports jersey found on the bathroom floor, and standards from the victims and the Defendant. S.T.'s vaginal swab indicated the presence of sperm and DNA from S.T. and an unknown male individual. S.T.'s oral swab did not indicate the presence of semen. Agent Proctor stated that the swab from the concrete contained sperm and non-sperm cells. The non-sperm cells contained a mixture of genetic material from at least two people; the major contributor was S.T., and the minor contributor was inconclusive due to insufficient or degraded DNA. The sperm cells matched the Defendant's DNA at "location

-13-

VWA." He stated that the probability of an unrelated individual's having the same DNA profile exceeded the world population.

Agent Proctor testified that the swabs from the blue jogging pants tested negative for semen. The blue sports jersey contained sperm and non-sperm cells; similar to the concrete swab, S.T. was the major contributor for the non-sperm cells, and the minor contributor was inconclusive due to insufficient or degraded DNA. The sperm cells matched the Defendant's DNA, and the probability of an unrelated individual's having the same DNA profile exceeded the world population.

On cross-examination, Agent Proctor testified that the sperm found in S.T.'s vagina did not match the Defendant. Agent Proctor stated that he examined A.L.'s oral swab and that it was also negative for semen. He agreed that the police provided no photographs of the concrete from which one swab was taken. Agent Proctor acknowledged that DNA evidence could not determine whether a sexual encounter was consensual. Agent Proctor stated that the unknown male's DNA in S.T.'s vaginal swab was not found on the blue jogging pants or blue sports jersey.

On redirect examination, Agent Proctor testified that if a suspect did not ejaculate into a victim's "vaginal vault," it was common not to find sperm there. Similarly, if a victim spit out ejaculate and later rinsed her mouth or drank liquids, it would not surprise Mr. Proctor if sperm were not present in the victim's mouth.

KPD Investigator Bryan Moran testified that on February 1, 2011, he responded to A.L.'s apartment, where both victims were standing outside with the responding patrol officers. Investigator Moran recounted A.L.'s and S.T.'s statements to him, which were generally consistent with their trial testimony; however, his recitation of the statements did not include A.L.'s mouth having been penetrated. Investigator Moran testified that A.L. walked him and the crime scene technicians through the apartment and that the apartment was in disarray. He agreed that the apartment's appearance was consistent with a home robbery. He stated that the victims were distraught, crying, shaking, and exhibited "borderline hysteria." Investigator Moran noted that this was common following a violent attack. He stated that the victims gave physical descriptions of the two men. Investigator Moran said the victims estimated that thirty minutes passed before they reported the rapes. Investigator Moran said that most rape cases were not immediately reported and that some victims did not pursue criminal charges.

Investigator Moran testified that after canvassing the area, he received information that one of the suspects who fled the scene was the Defendant. He agreed that the Defendant's appearance was similar to the victims' description. After investigating the crime scene, the victims were taken to the hospital for examination, and Investigator Moran composed a photographic lineup including the Defendant's photograph. Investigator

Moran brought the lineup to the emergency room, and each victim separately identified the Defendant as the person who raped them. He noted that neither of the victims hesitated when making the identification. Investigator Moran identified the completed lineups, which included A.L.'s and S.T.'s signatures and the date. He affirmed that neither victim knew the Defendant prior to the incident. Investigator Moran was not present when S.T. was examined at the hospital.

Investigator Moran participated in the Defendant's arrest and confiscated a sweatshirt, tennis shoes, and gardening gloves. He identified the clothing exhibits as those he collected, and he agreed that the clothing matched the victims' description. Investigator Moran noted that the Defendant had tattoos on his hands that he might have wanted to hide with the gloves.

Investigator Moran testified that a couple of days after the robbery, another investigator gave him co-defendant Davis's name. He agreed that co-defendant Davis also fit the description the victims provided. A.L. was unable to identify co-defendant Davis in a photographic lineup because she was in the bedroom for most of the robbery.

Investigator Moran acknowledged that the victims were initially reluctant to admit that the incident was drug related, and he stated that in home invasions, it was common for victims not to refer to any illegal activity in the home. He stated that in his experience, home invasions were often drug related.

Investigator Moran testified that he interviewed Mr. Bumby as a witness, and that prior to April 2012, he sought a presentment from the grand jury regarding Mr. Bumby, but that the Grand Jury found insufficient information to issue an indictment. Investigator Moran stated that based upon new information he had since received, he would probably "be presenting something to the Grand Jury on Mr. Bumby again."

On cross-examination, Investigator Moran testified that he arrived a few minutes after the victims' 11:40 a.m. 9-1-1 call. He agreed that A.L. admitted having sold prescription pills from her apartment in the past. Investigator Moran stated that A.L. described Mr. Bumby as an acquaintance and told him that Mr. Bumby had come by the apartment twice that day to buy prescription pills. A.L. reported that two cell phones, thirty dollars in cash, and prescription medication were missing from the apartment. To Investigator Moran's recollection, A.L. had no visible injuries, and he did not see "six to eight inches of her hair yanked out," although he noted that she reported having been hit by one of the men. He agreed that S.T. gave an address on Morning Crest Way. Investigator Moran did not recall when S.T. first disclosed the victims' having gone to S.T.'s hotel. Similarly, he did not remember the victims' mentioning that they had stopped anywhere else to get help.

Investigator Moran testified that he searched the Defendant's residence on the evening after the robbery and that no gun, cell phones, marijuana, DVDs, or cash were recovered there. He did not recall A.L.'s telling him that she had a dispute with a drug dealer named James from Chattanooga or "any connection" with a man named "Five Foot Giant." Investigator Moran stated that A.L. did not report having sold marijuana on the day of the robbery.

On redirect examination, Investigator Moran testified that after the initial investigation, A.L. reported additional items missing from her apartment. Investigator Moran affirmed that during the initial interview, A.L. was very distressed and unaware of what had been stolen from her. He stated that he did not look at any part of the victims' bodies closely and that he assumed that medical personnel would "take care of that." Investigator Moran agreed that several hours elapsed between the time of the robbery and the Defendant's arrest, during which the Defendant would have had "more than enough time" to dispose of the proceeds of the robbery. Investigator Moran did not know which individual took the respective pieces of property stolen. Investigator Moran stated the fact that no gun was recovered did not mean that the Defendant did not have a gun during the robbery.

After the State's proof, the Defendant testified that he was thirty-one years old and that he had previously been convicted of possession with the intent to sell and deliver "narcotics," theft, and aggravated assault. He stated that on February 1, 2011, he was living at a halfway house for federal inmates. The Defendant said that the house had curfew rules and that the residents were assigned chores. On the day of the incident, the Defendant was assigned outdoor tasks, for which he used the gardening gloves that were entered as evidence.

The Defendant testified that on the day of the incident, he took a bus to "Labor Ready" to look for a job. He said that he was walking through the Labor Ready parking lot when he saw two women sitting by a blue Marquis vehicle outside a nearby laundromat. He stated that he saw A.L. and that she greeted him. The Defendant averred that A.L. asked if he was from the area and that he responded that he was from across town but had family nearby. He told the women a family member's nickname, "Rock," and S.T. asked if he meant Travis Burgins, which the Defendant confirmed. The Defendant stated that he asked the women what they were doing and whether they were sick because they were "kind of shaking." According to the Defendant, S.T. told him that they were not sick and that they were doing laundry. S.T. stated that they were looking to trade marijuana for pills. The Defendant told them that he had a couple of pills, and S.T. responded that she did not carry the marijuana with her. The Defendant stated that S.T. asked the Defendant to come with them and that he entered the backseat of S.T.'s car. During the drive, they discussed where they were from in Knoxville. He stated that A.L.'s cell phone rang and

that she told the caller, "[Y]ou just left, but let me take care of this business and then you can come on back[.]"

The Defendant testified that they arrived at an unfamiliar apartment complex and that they went inside A.L.'s apartment; the Defendant entered after the victims and locked the door upon A.L.'s request. A.L. walked into another room, and the Defendant gave S.T. two pills, one of which he knew was Oxycontin; he did not know what the second pill was. He stated that S.T. began crushing the pills and that A.L. returned with a plastic bag full of marijuana. According to the Defendant, the marijuana was of poor quality, and he asked if the women could pay him cash for the pills instead. He said that S.T. conveyed that the marijuana was all they had and that A.L. responded that he could take it or wait in the apartment. The Defendant stated that when he repeated that he did not want the marijuana, A.L. offered for both women to have sex with the Defendant as payment for the pills. He said that the victims consumed the powdered pills.

The Defendant testified that S.T. was wearing a blue sports jersey and blue pajama bottoms, that S.T. removed her pants, and that A.L. sat on the bed. The Defendant proceeded to give an detailed account of consensual sexual activity between him and the victims, including conversation between the three of them indicating the victims' enjoyment of the activities and S.T.'s requesting that the Defendant perform oral sex on her. The Defendant stated that at one point, S.T. digitally penetrated herself and placed her finger in her mouth. The Defendant described receiving oral sex from both victims and stated that after he ejaculated into S.T.'s mouth, he asked S.T. if she was going to swallow the semen. He stated that S.T. responded negatively and went into the bathroom, and A.L. asked if he had more pills and suggested an additional transaction when A.L.'s friend arrived. The Defendant stated that he declined and that he gave A.L. his telephone number. He said that A.L.'s cell phone rang and that she told the caller to come up to the apartment.

The Defendant testified that he declined a ride from S.T. and that as he walked out of the apartment, he saw a two-door "dark car with dark tints," which was driven by a large Caucasian man with blonde hair who was looking up toward the apartment. The Defendant stated that co-defendant Davis was the car's passenger and that he knew co-defendant Davis from the halfway house. The Defendant said that he declined a ride from the two men and walked back to the bus station. The Defendant explained that he had forgotten about going to Labor Ready and that he was thinking, "I'll figure it out later on down the line maybe this is going to be a definite thing if [he would] . . . come on back out here or anything to the South side."

The Defendant denied that either victim ever indicated that she did not want to participate in sexual activity. Similarly, he denied digitally penetrating the victims, removing A.L.'s tampon, or pointing a gun at the victims. He noted that he did not possess a gun. The Defendant denied that either victim asked him to stop. The Defendant stated

that the apartment was clean, and he denied taking a DVD player, video game console, or money from the victims. He denied forcing the victims to stay in the bedroom or telling the victims that they had to engage in sexual activity. He claimed that A.L. spontaneously offered sex as payment.

On cross-examination, the Defendant admitted that he was at A.L.'s apartment at between 9:00 and 10:00 a.m. on the day of the incident and that S.T. was present. He acknowledged that his penis was in S.T.'s mouth during that occasion. The Defendant stated that he had a friend who worked at a Labor Ready location in East Knoxville. The Defendant acknowledged that in a recorded conversation, he told this friend that he loved her; he noted, though, that he was only friends with her and that his statements to her were "a way of getting bond made[.]"

When asked whether he had a bus ticket to verify his account of traveling from the halfway house to the South Knoxville Labor Ready, the Defendant stated that the halfway house director gave them bus tickets that were thrown away after they were used. The Defendant acknowledged that he did not have any record of his bus trip. The Defendant agreed that the victims accurately testified that they did not know him before February 1, 2011.

The Defendant testified that A.L. never undressed and that S.T. only removed her pants. He noted that A.L. told him that she was menstruating. The Defendant stated that relative to the unidentified pill, a friend gave it to him and that he had not confirmed whether his friend accurately described the pill. When asked whether S.T. also offered sexual favors in exchange for the pills, the Defendant responded, "Well, she was around, but [A.L.] crushed my pills . . . and she was the one that told me that basically them pills that I had was a local drug, basically, so yes." When asked whether A.L. was responsible for providing the sexual favors, the Defendant responded negatively and stated that A.L. had been unable to stop S.T. from crushing the pills. The Defendant asserted that no one was upset when he left the apartment.

The Defendant recounted his version of events a second time. He added that in the car, S.T. gave her boyfriend's name, but the Defendant did not know him. The Defendant also stated that during the sexual encounter, S.T. placed her fingers in the Defendant's mouth and not her own. The Defendant described ejaculating while A.L. performed oral sex. The Defendant further said that he told S.T. not to swallow the semen before asking if she was going to do such. The Defendant noted his opinion that swallowing was "just for whoever . . . is real acquainted, boyfriend/girlfriend[.]" He stated that A.L. suggested that they purchase more pills from him with money and "fool around" as well. The Defendant averred that he declined the latter and asked A.L. to pay with money.

The Defendant testified that when he saw the two men in the car as he left, the driver passed something to co-defendant Davis. Co-defendant Davis asked the Defendant if he "had anything," and the Defendant responded negatively. The Defendant stated that as he walked to the bus stop, he considered "tak[ing the victims] up on their offer again" the following week.

The Defendant testified that after signing in at the halfway house, he went to the career center at a community college and used a "floppy disk" to search for jobs. He stated that he checked back in to the halfway house at 11:40 a.m. The Defendant said that Investigator Moran arrested him at about 7:30 p.m. and collected his clothing. The Defendant averred that he had worn a sweatshirt and tennis shoes that morning and that the gloves had been in his back pocket; he said, though, that the pair of pants the police took were not the ones he wore. When asked whether he told Investigator Moran about the consensual sexual encounter, the Defendant responded negatively, claiming that he chose to exercise his right to remain silent.

The Defendant testified that his trial testimony was the first time he had disclosed his version of events. When asked whether he had time to think about his testimony, the Defendant responded that if a person was telling the truth, "it just automatically just is there." The Defendant affirmed that he had reviewed the State's evidence prior to trial, and he noted that he had a right to review the evidence against him. He agreed that he was present at the preliminary hearing, at which A.L. and S.T. testified. The Defendant stated that he saw the crime scene photographs in January before the trial after he requested a new attorney. The Defendant identified a handwritten, pro se motion for "recusal" of his first defense counsel, and he opined that he had not been properly represented. The motion was written on a yellow piece of lined paper.

The Defendant testified that he was not disputing that his DNA was recovered, and he averred that "everything was agreeable" during the encounter. He asserted that both victims and co-defendant Davis had lied during their testimony. The Defendant stated that his mother "raised [him] to always respect all women." When asked whether his mother raised him to receive oral sex from two strange women in exchange for pills, the Defendant responded negatively, but noted that he was an adult and that "[t]hey all agreed . . . to do that." The Defendant hypothesized that the semen found on the sidewalk "could've been placed anywhere . . . . [I]t didn't have to come out of her mouth . . . she could've scooped it or whatever[.]" He disagreed that he could have "left a trail" of semen himself. The Defendant denied knowing anyone named Fats. He admitted the possibility that if a criminal thought another person had drugs or cash, it might be a motivation to commit a home invasion. He said that "it depend[ed]" whether a person could accomplish two objectives by robbing an individual with whom the person was angry.

The Defendant testified that as he left A.L.'s apartment, he saw Tyran Goodwin, his cousin's brother, from a distance. He denied that he told co-defendant Davis that he ran into his cousin.

The Defendant testified that on February 1, 2011, he had only known co-defendant Davis for two or three months. The Defendant denied having sent letters to co-defendant Davis in prison. When shown one such letter, the Defendant stated that he did not recognize it. The letter, which was received as an exhibit, was written in all capital letters in pencil on a lined yellow page, and the top of it had been torn such that the beginning of the letter was partially missing. The prosecutor read[6] the complete portions of the letter aloud:

> All I'm doing was trying to have you cover like a real homey [so] [y]ou won't be blind when they ask you these question[s,] how they get your name and why someone will say some s--t like that. But that's why I ran it past you like that to give you a heads up just in case they put us together. But this is why I need you over here or whatever, so we can rehearse this s--t cause two heads is better than one. All I know is real homey you . . . never[7] seen another side of me, so I'm the only one you can trust. Can't get[8] fishy or weird about this, I told you that your attorney will come and see you [the] first of the year to do your case, because she got so many cases to do, whoever go up first or have the earliest court date go before you. But your time will be one month before you go to court. And I've got a motion over here to get a new attorney, if you don't feel good with the one you got now. This . . . case is not complicated to beat at all [because all] it is he say, she say. No evidence whatsoever. The only way they will get you if they have real evidence, or you say that you were there and you . . . want a deal. Now we both hit. Don't cop to s--t and you can walk free. That's what they want and need you to do so they can have a real case on you. So, Bro, you can do what you please, you don't know me and I don't know you but at the halfway house. You got to keep calling your attorney and file motions if you want to know about your case, because it's not coming out of the blue, your attorney is only as good as you. Never ask me to do something for you and you have

---

[6] Although the original letters were received as exhibits and available for examination by the jury, they contain multiple misspellings and phonetic spellings such that it is more efficient for us to recount the prosecutor's recitations. We have examined the original letters to ensure that the prosecutor accurately conveyed the letters' meaning and will note what the letter stated if the meaning was ambiguous.

[7] In the letter, this was spelled "nere."

[8] The letter stated "Ant s--t" rather than "Can't get" here.

-20-

different ways when I do.  I'm trying to help you think where you might be slipping on thinking.  My bad for being real with you as a homey.  Just let me know what you think.  My fan ban is on the way.  We're that -- want to show so we can walk free.[9]

The remaining lines were incomplete and partially illegible; the last sentence read, "You no who."  The Defendant denied that he wrote the letter or sent it to co-defendant Davis.  He agreed, though, that he obtained a new attorney, as did co-defendant Davis.

A second letter was received as an exhibit, which was written on yellow lined paper in pencil in all capital letters.  The script was more slanted than the first letter.  The prosecutor read the letter into the record:

Spud, what's up with you over there?  Well, I'm just hitting you up because [if] nobody else care what happen to you, just know I care what happen to you.  You like my little brother that I never had.  My attorney came up here today[10] to see me and said that you go to court on the 27th and the [c]ourt will give you a new attorney.  She said that she read some s--t on you and still wonder why the h-ll you're locked up [and] all they got is the back of your head and legs.  She said that really you can represent your d--n self and beat your s--t.  She said that's why they keep putting you off.  Hopefully you will take a deal, because you're tired of sitting.  Plus she said that the DA got your letter that you sent to them.  I told her that you're built Ford tough and they will be better off breaking steel with their hands than f--k with you.

Rock got out last Thursday and you know what he's on out there, I don't have to say it on paper.  I remember when we used to f--k ho-s together, because Dee's got the best p---y I had in a minute and we done so much good time together and now this bulls--t together and we will make out together.  So to say that to say this, homey, just to let you know that I'm glad to call you my real friend.  And if I don't see you in the next two weeks, then I will see you in the free world soon.  Homey, keep your head up and when I get out you know I got you, because like I said before, you will never run across a 2 you would've been hit the same night and I never show you a weak side of me, because I don't have one.  One[11] real.  But thank you for letting me know what was said behind my back, but like you told me, you have nothing

---

[9] The letter reads, "my fam-bam is on the way were thay wont show so we can walk free[.]"

[10] The letters reads "Friday" instead of today.
[11] The letter reads, "born real," not "one real."

to worry about, and that's [on] my hand.[12]  Don't fall for that shit.  And do you even think in your mind that I would confess to that shit.  And I . . . didn't do it.  That [sixty] years got me f---ed.[13]  We got it beat and haters don't want us to beat it.  N---as talk because they got lips. We been through too much together to turn around now.  Plus a mouth is like an a--hole, nothing but s--t will fly out that s--t.  Just stick to the game plan and everything will work out.  My end is cool.  I don't know you and you don't know me but at the halfway house.  Like Gotty said, Jizzie[14] don't do it.  Much love [homey].  PS, I am the realest, can't change me for sure.[15]

The Defendant denied writing the letter.  When asked if he was telling the jury that he was the victim of a conspiracy between the victims, the KPD, and the TBI, the Defendant answered affirmatively.  He stated that he had no reason to explain why the victims had lied.  When the prosecutor noted that the victims had little to gain by lying and had "been through a lot," including their preliminary hearing and trial testimony, as well as being cross-examined by "very competent" defense counsel, the Defendant stated, "[If] you're down on your luck, you know, that's the best way to go is to fabricate these stories."  He averred that he was not lying to the jury and had "[his] life to gain for these false allegations."

On redirect examination, the Defendant testified that the TBI never took handwriting samples from him to compare to the letters.  He denied that the State had ever petitioned the court to obtain such a sample.

### B.  Verdict, Sentence, and Appeal

Following the conclusion of the proof, the jury found the Defendant guilty of all counts of aggravated rape and especially aggravated kidnapping, as well as the aggravated robbery of A.L.  The jury returned a not guilty verdict in Count 11, the aggravated robbery of S.T.  After a sentencing hearing, the trial court imposed thirty-two-year sentences for each count of aggravated rape and especially aggravated kidnapping at one hundred percent service as violent felonies and a sixteen-year sentence for aggravated robbery at eighty-five percent service.  The court ordered partially consecutive service for an effective ninety-six years in confinement.

---

[12] The letter reads, "hood," not "hand."

[13] The letter reads, "that's 60 years got me f--k up."

[14] The letter reads, "like 'Gotti sad gezzy dont do it.'"

[15] The letter reads, "I am the realest, can't change me for s--t."

The Defendant filed a timely motion for new trial on June 28, 2012, which requested a new trial and reserved the right to amend the motion.[16] On January 20, 2021,[17] the Defendant filed an "amended motion for new trial or judgment of acquittal," in which he raised the following issues: (1) the evidence was insufficient to establish that the especially aggravated kidnappings were more than incidental to the aggravated robbery because the Defendant's taking of a cell phone was incomplete at the points in time in which he confined the victims to the bathroom and bedroom, citing State v. White, 362 S.W.3d 559 (Tenn. 2012); (2) the trial court erred by affirming the jury's verdict as thirteenth juror; (3) the court erred by allowing the State to impeach the Defendant with his prior conviction for aggravated assault, arguing that the conviction was "minimally probative of honesty" and that the danger of unfair prejudice based upon the Defendant's propensity for violence substantially outweighed the probative value; (4) the court erred by allowing both victims to remain present in the courtroom before they testified, arguing that the victims' constitutional right to be present "is not superior to a defendant's due process rights to a fair trial," that the victims were only alleged victims at the time of trial, and that the Defendant enjoyed a presumption of innocence at that stage of the proceedings; and (5) the court erred by allowing the admission of the Defendant's letters to co-defendant Davis, arguing that "further authentication should have been required" in addition to the Defendant's admitted authorship of a pro se motion, giving as examples asking co-defendant Davis whether he had seen or received the letters and from where he obtained them.

At the motion for new trial hearing, the Defendant argued the issues consistently with his written motion. The trial court found relative to the kidnapping convictions that the court gave a White jury instruction and that as a result, the issue was solely the sufficiency of the evidence. The court noted, "[S]ufficiency of the evidence is not cognizable in a motion for new trial because a sufficiency argument would result in dismissal of one of the counts, not in a new trial."[18] The court found relative to the weight of the evidence that the previous judge agreed with the jury's verdict at the time of trial.

Relative to admission of the Defendant's aggravated assault conviction, the trial court found that the Defendant received "some benefit" from the court's not allowing one

---

[16] The technical record reflects that on the day of the sentencing hearing, the judgments were entered, trial counsel withdrew, trial counsel filed the motion for new trial, and appellate counsel was appointed.

[17] Other than a February 27, 2014 pro se motion by the Defendant to determine the status of his case, the record is silent as to why the proceedings remained pending for more than eight years. Appellate counsel noted in the appellate brief, though, that an unexplained delay occurred in obtaining the trial transcript.

[18] The Defendant correctly noted in his appellate brief that his motion for new trial also included a motion for judgment of acquittal. In any event, because this court does not waive consideration of issues of sufficiency of the evidence and sentencing even in the absence of a motion for new trial, it does not affect our review of the Defendant's sufficiency issue on appeal.

of the felony drug convictions to be used as impeachment evidence. The court stated that although aggravated assault was a violent crime, it was different than a sexual offense and that the prejudicial effect was accordingly lessened. The court found that even if evidence of the conviction was erroneously permitted, the proof was overwhelming and any error was harmless.

Relative to the victims' presence in the courtroom, the trial court noted that the constitutional provisions regarding victim's rights did not distinguish between victims and alleged victims. The court found that the constitution allowed the victims to be in court at all times that the Defendant was present and that the constitution "trump[ed] any sort of evidentiary rule" with which it conflicted.

Relative to the letters, the court found that a handwriting expert was not required, that the Defendant acknowledged having written the pro se motion used as an exemplar, and that the jury could determine whether the Defendant wrote the other letters. The court applied Tennessee Rule of Evidence 901(b)(3) regarding authentication using a known exemplar as well as Rule 901(b)(4) allowing authentication through "[a]ppearance, contents, substance, internal patterns or other distinctive characteristics taken in conjunction with the circumstances." The court found that when viewed in conjunction with the other evidence, the content of the letters was sufficient to allow the jury to determine that the Defendant wrote the letters and that he referred to events that occurred in this case. The court denied the motion for new trial, and the Defendant timely appealed.

## ANALYSIS

On appeal, the Defendant argues that (1) the evidence was insufficient to support his convictions for especially aggravated kidnapping, contending that the State failed to establish confinement that exceeded the aggravated robbery; (2) the trial court erred by allowing the State to use the Defendant's prior aggravated assault conviction as impeachment evidence; (3) the court erred by allowing the victims to be present in the courtroom before their trial testimony; and (4) the court erred by admitting the Defendant's letters without adequate authentication. We will address each issue in turn.

## I.      Sufficiency of the Evidence

The Defendant contends that the evidence was insufficient to sustain his especially aggravated kidnapping convictions, arguing that insufficient proof existed that the victims' confinement or removal was more than incidental to the robbery.[19] The State responds that the evidence was sufficient.

_____

[19] The Defendant concedes that the evidence was sufficient relative to his other convictions.

-24-

An appellate court's standard of review when a defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id.; see State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The standard of proof is the same whether the evidence is direct or circumstantial. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011). Likewise, appellate review of the convicting evidence "is the same whether the conviction is based upon direct or circumstantial evidence." Id. (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

As relevant here, especially aggravated kidnapping occurs when a person "knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty," and it is accomplished using a deadly weapon. Tenn. Code Ann. §§ 39-13-302, -305(a)(1).

The Defendant submits that any removal or confinement of the victims was incidental to the robbery,[20] arguing that the taking of A.L.'s cell phone was incomplete until the Defendant left the apartment with it. Alternatively, the Defendant argues that he is guilty of only two counts of especially aggravated kidnapping, one for each victim. The State responds that the Defendant confined the victims in the bedroom before the rapes and

---

[20] Although the Defendant states in his appellate brief that the confinement in this case was "merely incidental to the commission of the rape and robbery offenses," his written motion for new trial and argument at the motion for new trial hearing only discussed this issue as it pertained to the robbery conviction. In addition, the Defendant has not included any argument in the brief relative to why the confinement was merely incidental to the rapes. See Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court"). However, because this court does not waive consideration of sufficiency issues, we will briefly address the White issue in the context of the rapes for the sake of thoroughness.

in the bathroom after the rapes to a greater degree than was necessary to commit aggravated robbery and aggravated rape.[21]

In State v. White, the Tennessee Supreme Court concluded that the legislature intended "to punish as kidnapping only those instances in which the removal or confinement has criminal significance above and beyond that necessary to consummate some underlying offense, such as robbery or rape." 362 S.W.3d 559, 577 (Tenn. 2012). Accordingly, "trial courts should specifically require a determination of whether the removal or confinement is, in essence, incidental to the accompanying felony or, in the alternative, is significant enough, standing alone, to support a conviction." Id. at 578. In order to provide guidance to trial courts, our supreme court set forth a particular jury instruction for courts to use when instructing on kidnapping offenses. Id. at 580-81.

In this case, the Defendant does not dispute that the jury was properly instructed according to White. Nevertheless, the Defendant contends that the jury erred by finding sufficient proof to satisfy a conviction for especially aggravated kidnapping independent of his convictions for aggravated robbery and aggravated rape. We disagree.

Viewed in the light most favorable to the State, the proof at trial showed that the Defendant and co-defendant Davis entered A.L.'s apartment, held the victims at gunpoint, and ransacked the apartment looking for money and drugs. While co-defendant Davis searched the apartment, the Defendant forced A.L. and S.T. to undress, still pointing a gun at them. Co-defendant Davis saw the nude victims, encouraged the Defendant to leave, and left the apartment. The Defendant raped both victims digitally and orally, and he vaginally raped S.T. After the Defendant ejaculated into S.T.'s mouth, he made the victims stand and walk into the bathroom, where he held them at gunpoint and ordered A.L. to face the shower. The Defendant made S.T. clean her mouth and genitals, reducing the chance that he would be identified as the perpetrator of the rapes. The Defendant then took the victims back into the bedroom, made them lie down on the floor, and held them at gunpoint while he threatened to kill them, asked them for a reason he should not kill them, and instructed them not to call the police. The Defendant's DNA was found on a blue sports jersey with which S.T. cleaned herself in the bathroom and on the sidewalk outside the apartment, where S.T. testified she had spit before going to look for help. Co-defendant

---

[21] We note that during closing arguments, the State specified that the especially aggravated kidnapping charges referred to when the Defendant took the victims into the bathroom after the rapes and back into the bedroom before he fled. The State may not change theories on appeal. See State v. Adler, 71 S.W.3d 299, 303 (Tenn. Crim. App. 2001). Nevertheless, as we discuss below, the State's original articulation of the facts underlying the respective especially aggravated kidnapping charges satisfies White.

Davis testified that after he completed the robbery and returned to the car, he and Fats waited for a period of time for the Defendant to emerge.

A reasonable jury could have found that the Defendant confined and removed the victims to the bathroom and the bedroom to a greater extent than that necessary to commit aggravated robbery. We similarly conclude that the Defendant confined and removed the victims to a greater degree than that necessary to commit aggravated rape. The Defendant could have stolen A.L.'s cell phone and accomplished the rapes without remaining in the apartment to force the victims inside the bedroom and bathroom, respectively, and hold them there at gunpoint. See, e.g., State v. Jonathan Kyle Hulse, No. E2011-01292-CCA-R3-CD, 2013 WL 1136528, at *14 (Tenn. Crim. App. Mar. 19, 2013) (concluding that the defendant's actions went "well beyond that necessary to consummate the rape" when after raping the victim, the defendant chased her with a boxcutter, grabbed the victim's ankles, and pulled her down and dragged her along a sidewalk to prevent her from summoning help).

However, we are constrained to agree with the Defendant's argument—albeit sparse and without citation to authority—that the evidence supported only two counts of especially aggravated kidnapping, one for each victim. Although the Defendant removed and confined each victim in two distinct locations inside the apartment, our supreme court has previously held that kidnapping is a continuing offense, which by its nature "[does] not lend itself to division into segments of time with various points of termination . . . . [and] **'an act of removal or confinement does not end merely upon the initial restraint, and a defendant continues to commit the crime at every moment the victim's liberty is taken.'"** State v. Adams, 24 S.W.3d 289, 294-95 (Tenn. 2000) (quoting State v. Legg, 9 S.W.3d 111, 117 (Tenn. 1999)) (emphasis in original); see State v. Jimmy Lee Whitmire, No. M2007-01389-CCA-R3-CD, 2009 WL 2486178, at *17 (Tenn. Crim. App. Aug. 13, 2009) (extending Legg's reasoning to especially aggravated kidnapping). Accordingly, the evidence at trial only supports one count per victim of especially aggravated kidnapping because the Defendant continuously confined each victim from the beginning of the robbery and the Defendant's fleeing the apartment after the rapes.

In addition, the State's choice to split a single instance of kidnapping into two indicted counts per victim, one for removal and one for confinement, is an example of what this court recently called a "disconcerting trend" of the State's improperly charging alternative theories of guilt for the same offense in more than one count of an indictment. State v. Darius Patterson, No. E2019-01173-CCA-R3-CD, 2020 WL 3969294, at n. 2 (Tenn. Crim. App. July 14, 2020), perm. app. denied (Tenn. Dec. 3, 2020). In Patterson, the defendant was indicted for two counts of especially aggravated kidnapping and two counts of aggravated kidnapping related to one incident in which the victim was taken from his home, forced to remain in a car, and made to enter another residence, where he was bound and beaten at gunpoint. Id. at *3. This court noted that the resulting multiplicity of

such a practice "'may carry the potential of unfair prejudice, such as suggesting to the jury that a defendant is a multiple offender or falsely bolstering the [S]tate's proof on such issues as the defendant's motive or knowledge of wrongdoing' and 'can lead to multiple convictions and punishment for only one offense.'" Id. at n.2 (quoting State v. Whitmore, No. 03C01-9404-CR-00141, 1997 WL 334904, at *9 (Tenn. Crim. App. June 19, 1997) (citations omitted)). This court also noted that a potential for confusion existed both for the parties, the court, and the jury, and generally cautioned against creating multiplicity in indictments. Id.

In Patterson, any concern about multiple punishments was resolved at sentencing because the trial court merged the respective convictions. Id. However, in this case, the trial court did not merge any of the convictions and instead ordered concurrent service of the sentences. The sentencing hearing transcript is not included in the appellate record, making it unclear to us whether merger was discussed; nevertheless, the failure to merge Count 6 with Count 7 and Count 8 with Count 9, respectively, was error. We direct the trial court to enter amended judgments in Counts 6, 7, 8, and 9 to this effect. Because the effective length of the Defendant's sentence remains the same due to the partially consecutive sentencing structure, we need not remand the case for a new sentencing hearing.

## II.     Prior Conviction

The Defendant contends that the trial court erred in ruling that his prior conviction for aggravated assault could be used for impeachment pursuant to Tennessee Rule of Evidence 609, arguing that the prejudicial effect of a prior conviction for a violent offense substantially outweighed its probative value relative to credibility. The State responds that the aggravated assault conviction was different in nature from the violent sexual offenses in this case and that the conviction was properly admitted as impeachment evidence.

Rule 609(a)(3) of the Tennessee Rules of Evidence allows for the admission of a prior conviction to impeach the credibility of a defendant testifying at trial. Such an impeaching conviction must be either "punishable by death or imprisonment in excess of one year under the law under which the witness was convicted" or "must have involved dishonesty or false statement." Tenn. R. Evid. 609(a)(2). Prior to its admission, the trial court is required to determine whether "the conviction's probative value on credibility outweighs its unfair prejudicial effect on substantive issues." Tenn. R. Evid. 609(a)(3). This court will only reverse a trial court's decision in this regard for an abuse of discretion. State v. Williamson, 919 S.W.2d 69, 78 (Tenn. Crim. App. 1995).

In determining whether the probative value of a prior conviction on the issue of credibility outweighs its unfair prejudicial effect on the substantive issues, a trial court should consider (1) the relevance of the impeaching conviction with respect to credibility,

and (2) the similarity between the crime in question and the underlying impeaching conviction. State v. Waller, 118 S.W.3d 368, 371 (Tenn. 2003). The court "should explain on the record how the impeaching conviction is relevant to the defendant's credibility." Mixon, 983 S.W.2d 661, 674 (Tenn. 1999). The fact that a prior conviction involves the same or similar crime for which the defendant is being tried does not automatically require its exclusion. State v. Baker, 956 S.W.2d 8, 15 (Tenn. Crim. App. 1997); State v. Miller, 737 S.W.2d 556, 560 (Tenn. Crim. App. 1987). However, if "the prior conviction and instant offense are similar in nature the possible prejudicial effect increases greatly and should be more carefully scrutinized." Long v. State, 607 S.W.2d 482, 486 (Tenn. Crim. App. 1980). This court has previously noted that "felonies of a violent nature reflect on the moral character of a witness" and that the convictions are "not usually without probative value." State v. Blanton, 926 S.W.2d 953, 960 (Tenn. Crim. App. 1996) (quoting State v. Daniel Strong, No. 88-82-III, 1989 WL 34942 (Tenn. Crim. App. Apr. 12, 1989)). The trial court must analyze the prior conviction and the offense on trial to determine if the conviction's probative value on credibility is outweighed by the danger of unfair prejudice.

In this case, on the first day of trial before jury selection, the trial court discussed the Defendant's four prior felony convictions, which were for aggravated assault, theft, and two instances of possession of a controlled substance with the intent to sell or deliver. The court excluded one of the drug convictions as cumulative and found that the other three convictions were admissible for impeachment purposes. The court noted that the convictions occurred within ten years before the trial, that they were not the same offense as aggravated rape, that they bore on the Defendant's credibility, and that "not that much potential for unfair prejudice" existed.

Although the trial court failed to put on the record its reasoning for finding that the aggravated assault bore on the Defendant's credibility, we cannot conclude under the circumstances of this case that the court abused its discretion in determining that the probative value of the Defendant's aggravated assault conviction relative to credibility outweighed any danger of unfair prejudice to the Defendant. We agree with the trial court that although aggravated assault and aggravated rape are both violent offenses, a non-sexual assault is different in nature than a rape. We note that even though the court's explanation of the aggravated assault's relevance was lacking, the evidence of the Defendant's guilt was overwhelming, rendering any such error harmless. See Waller, 118 S.W.3d at 374; Tenn. R. App. P. 36(b) ("A final judgment . . . shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment"). The Defendant is not entitled to relief on this issue.

### III.    Witness Sequestration

The Defendant contends that the trial court erred by allowing both victims to be present in the courtroom before their respective testimonies, arguing that his due process

rights were impacted. The State responds that the victims were entitled to be in the courtroom and that any error was harmless.

The purpose of the sequestration rule, codified as Rule 615 of the Tennessee Rules of Evidence, "is to prevent one witness from hearing the testimony of another and adjusting his testimony accordingly." State v. Harris, 839 S.W.2d 54, 68 (Tenn. 1992) (citing Smith v. State, 554 S.W.2d 648, 651 (Tenn. Crim. App. 1977)). The rule provides, in pertinent part:

> At the request of a party the court shall order witnesses, including rebuttal witnesses, excluded at trial or other adjudicatory hearing. In the court's discretion, the requested sequestration may be effective before voir dire, but in any event shall be effective before opening statements. The court shall order all persons not to disclose by any means to excluded witnesses any live trial testimony or exhibits created in the courtroom by a witness. This rule does not authorize exclusion of (1) a party who is a natural person, or (2) a person designated by counsel for a party that is not a natural person, or (3) a person whose presence is shown by a party to be essential to the presentation of the party's cause.

Tenn. R. Evid. 615 (emphasis added). The Advisory Commission Comments to the 1997 Amendment specify that "[a] 'party that is not a natural person' includes . . . the State of Tennessee. Consequently, the prosecuting attorney could designate a crime victim, a relative of the crime victim, or an investigating officer. Like category (1), category (2) is a matter of right." For a defendant to be granted appellate relief based upon a Rule 615 violation, the defendant must demonstrate that a witness improperly changed his or her testimony after hearing other witnesses' testimony. State v. Sexton, 724 S.W.2d 371, 374 (Tenn. Crim. App. 1986); see State v. Michael Presson, No. W2012-00023-CCA-R3-CD, 2014 WL 1669860, at *21 (Tenn. Crim. App. Apr. 24, 2014).

In this case, after jury selection but before the beginning of trial, the Defendant asked for the rule of sequestration pursuant to Tennessee Rule of Evidence 615. The State requested that the trial court allow both victims to remain in the courtroom "as is their right under the victim's rights," referring to Article 1, section 35 of the Tennessee Constitution. The court released the jury for its lunch break and heard arguments on the issue. The Defendant averred that the victims were not natural necessary parties and were not "authorized" to be there. The State responded that the victims were authorized by statute to be present even though they were also witnesses. The court stated, "Well, I understand what the statute says but the victim['s] rights is an amendment to the Constitution and the Constitution trumps the statute. So we'll allow the victims to stay in."

This court recently considered a similar case involving the sequestration rule, which we find instructive. In State v. Johnny James Parrish, No. E2019-00664-CCA-R3-CD, 2020 WL 2510530, at *12 (Tenn. Crim. App. May 15, 2020), perm. app. denied (Tenn. Oct. 8, 2020), the victim remained in the courtroom over defense counsel's objection after the State asserted the victim's constitutional right to be present. The defendant requested a mistrial, and the trial court found that the state constitutional provision for victim's rights "trump[ed] Rule 615." The defendant argued at the motion for new trial and on appeal that his due process rights were tied to the protections of Rule 615.

On appeal, this court noted that it was not within our province to extend constitutional law to create a due process right to sequestration of witnesses. Id. at *14. This court determined that although the record did not reflect that the State explicitly designated the victim as its representative, previous opinions of this court indicated that when the State "argued at a motion in limine regarding Rule 615 that crime victims should not be excluded from the courtroom, such is tantamount to a designation of the victims as the State's representatives." Id. (citing State v. Lance Sandifer, No. M2008-02849-CCA-R3-CD, 2010 WL 5343202, at *9 (Tenn. Crim. App. Dec. 21, 2010)). This court noted that the remainder of the record did not indicate that the State designated anyone else, such as a detective, as its representative and concluded that the State's argument "operated as a de facto designation of the victim as its representative under Rule 615." This court also discussed that the defendant had not identified any testimony by the victim that had been altered to fit the State's evidence, noting that the victim's testimony was "at odds in many respects with that of the other eyewitnesses" and that the defendant relied on those inconsistencies when arguing his appellate issues. Id. at *15. Finally, this court observed that because the sequestration issue hinged on Rule 615, "examination of the State constitutional provision related to victim's rights [was] unnecessary." Id. (citing State v. Elkins, 83 S.W.3d 706, 713 (Tenn. 2002) (declining to address the State's assertion that the victim's rights provision of the Tennessee Constitution supersedes Rule 615, noting that it was "well-settled that courts generally do not decide constitutional issues if the case may be properly resolved on nonconstitutional grounds")).

Similarly, in this case, the record does not reflect that the State explicitly designated the victims as the State's representatives; however, its argument about the victims' right to be present operated as a de facto designation. As in Parrish, the State made no other designation of a law enforcement officer or other individual.

In addition, other than a general, unsupported claim that the State gained "an unfair trial advantage," the Defendant has not identified any alleged instances in which A.L. or S.T. improperly changed their testimony. See Parrish, 2020 WL 2510530, at *15; Presson, 2014 WL 1669860, at *21 (declining to grant relief when that the defendant alleged a police witness "conformed" her testimony to that of the victims without citing to altered testimony or any resulting prejudice). We note that defense counsel thoroughly cross-examined the

victims using their preliminary hearing testimony and police statements and that the jury had ample information with which to make its credibility determinations.

Finally, we briefly note that as in <u>Parrish</u>, the Defendant's issue relates to Rule 615 and may be resolved upon nonconstitutional grounds.[22]  Accordingly, we need not address the Defendant's constitutional question.  The Defendant is not entitled to relief on this basis.

## IV.    Letters

The Defendant contends that the trial court erred by admitting his letters to co-defendant Davis without adequate authentication.  The State responds that the Defendant has waived this issue by inadequately briefing it.

Rule 901(a) of the Tennessee Rules of Evidence states as follows:  "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims."  Evidence may be authenticated, in relevant part, through "[c]omparison by trier of fact . . . with specimens which have been authenticated."  Tenn. R. Evid. 901(b)(3).  Rule 901(b)(3) has been limited in Tennessee's appellate courts to authentication of a signature or handwriting using a known sample.  <u>See</u> <u>State v. Antonio Johnson</u>, No. W2017-00476-CCA-R3-CD, 2018 WL 625126, at *9 (Tenn. Crim. App. Jan. 30, 2018) (collecting Court of Appeals and Court of Criminal Appeals decisions).  Authentication issues are left to the discretion of the trial court.  <u>State v. Cannon</u>, 254 S.W.3d 287, 295 (Tenn. 2008) (citing <u>State v. Scott</u>, 33 S.W.3d 746, 752 (Tenn. 2000); <u>State v. Beech</u>, 744 S.W.2d 585, 587 (Tenn. Crim. App. 1987)).

During the Defendant's cross-examination, the trial court conducted a jury-out hearing, during which the State requested to cross-examine the Defendant using letters he wrote to co-defendant Davis.  The State noted that the letters contained impeaching information, that they did not refer to prior bad acts, and that they showed that his account of events at trial was untrue.  Defense counsel responded that the letters could not be proven to have been written in the Defendant's handwriting.  The State asserted that it had a sample of handwriting that the Defendant had acknowledged as being his and that even if the Defendant denied having authored the letters, they were admissible "pursuant Rule 901[.]"  The State continued that the letters contained information that only could have come from

---

[22] We further note that although the Defendant mentions due process concerns in his appellate brief, he does not set forth the applicable law on due process, the standard of review for a due process violation, or any caselaw supporting his position.  <u>See</u> Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court").

the Defendant. Defense counsel countered that without being properly authenticated, the letters were hearsay.

The trial court noted that pursuant to Tennessee Rule of Evidence 901(b)(3), the letters were admissible "under circumstances where there can be a comparison by the finder of fact . . . with specimens which have been authenticated." The court found that the Defendant had authenticated his handwriting in the pro se motion and that the letters were admissible.

This section of the Defendant's appellate brief is lacking, consisting of a statement without citation that the standard of review is abuse of discretion, a portion of the text of Rule 901(b)(3), and a citationless argument that the trial court should have required the State to provide "all relevant information concerning the sourcing and circumstances under which the letters were obtained, to assist the jury in considering the question of authenticity." The Defendant similarly does not specify to which letters he refers or provide any citations to the record.

It is the Defendant's responsibility to provide this court with an argument containing citations to the record and relevant authority, and this court will not scour applicable caselaw to make the Defendant's argument for him. See Tenn. R. App. P. 27(a)(7) (stating that appellate briefs should contain an argument "setting forth . . . the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record . . . relied on"); Tenn. Ct. Crim. App. R. 10(b). As a result, the Defendant has waived our consideration of this issue. We briefly note that the jury could readily compare the similarities in the handwriting between the pro se motion and the letters and that the other evidence of the Defendant's guilt was overwhelming. He is not entitled to relief on this basis.

<u>CONCLUSION</u>

Upon consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed relative to Counts 1, 2, 3, 4, 5, and 10; however, we reverse the judgments of the trial court relative to Counts 6, 7, 8, and 9, and remand the case for the merger of Count 6 with Count 7 and Count 8 with Count 9, respectively, and the entry of amended judgments reflecting the same.

_____
D. KELLY THOMAS, JR., JUDGE

-33-